RECEIVED
IN LAKE CHARLES, LA
APR - 9 2008
TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

| UNITED STATES OF AMERICA | : | DOCKET NO. 2:06CR 20089-014 |
|---|---|---|
| VS. | : | JUDGE MINALDI |
| ROBERTO ZAMORA | : | MAGISTRATE JUDGE KAY |

## MEMORANDUM RULING

This court held a hearing on the defendant's Motion to Suppress on April 1, 2009 and issued a ruling from the bench denying the motion to suppress in part. The court requested cases from both the defendant and the government[1] which address questioning the defendant about the presence of any weapons before being *Mirandized*.[2]

The totality of the circumstances establish that a custodial setting existed at the time the defendant was asked about weapons in the house. *Miranda* protections only become relevant when

---

[1] The Government e-mailed the court suggesting that *United States v. Castellana*, 500 F.2d 325, 326-327 (5th Cir. 1974)(en banc) applies to the case at bar. The defendant did not offer any cases within the time allowed by the court.

[2] The defendant argues that the statement about the presence of a gun in the house was made in response to questions that violated his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *See United States v. Patmon*, 3:05-00174, 2005 WL 2877739, 1(S.D.W.Va., 10/28/2005)(unpublished).

a person is in custody. *Miranda,* 384 U.S. at 444. The testimony established that officers had detained the defendant for hours with no *Miranda* warning. Officer Veliz testified that although Zamora was free to leave, no one told him so. The officers were entering the defendant's home and were in no immediate danger. The weapon seized was not in the defendant's immediate area and this was a warrantless search.

In *Castellana,* the defendant stopped about four feet from his desk and Officer Smith prepared to read the warrant, Officer Arwine suddenly asked Castellana whether he had any weapons within reach. Castellana replied that he did, pointing to a drawer in the desk. Arwine took four handguns from the drawer, one of which formed the basis of the indictment, and asked Castellana where he got them. Castellana answered that he took them in on a loan. Smith then read the warrant and advised Castellana of his Miranda rights, which he refused to waive. The four handguns were unloaded and placed on the desk as the officers searched the defendant and the store. At no time was anyone arrested.

The court held that, even assuming Castellana was 'in custody' under inherently coercive conditions when Arwine asked his questions, *Miranda* was not infringed, for Arwine was not interrogating Castellana in an attempt to elicit evidence of a crime. The safety of the operation was Arwine's primary concern, he testified, and the very form of his first inquiry- weapons within reach- shows it was limited to this proper concern. The court found the action by the officers in *Castellana* was a bona fide and minimally offensive security measure in the line of *Terry v. Ohio,* 329 U.S. 1 (1968). The court did not condemn what it considered to be mild prophylactic measures reasonably calculated to ensure the safety of the officers, the suspect, and others on the scene as well.

It is interesting to note that the court in *Castellana,* while finding no reason to suppress the

2

statement that there were guns in the drawer under the rationale above, later in the opinion agreed that the answer to the follow up question about where he got the guns was interrogation, and was not related to concerns about officer safety. Accordingly, the court suppressed that statement.

Five judges dissented in *Castellana*. The dissent distinguished *Terry*, stating that *Castellana* did not involve a search and seizure, but involved compelled self-incrimination. The dissent noted that the Supreme Court specifically limited *Terry*'s holding to cases in which an officer reasonably concludes "that the person with whom he is dealing may be armed and presently dangerous." 329 U.S. at 30.

*Castellana* is readily distinguishable from the facts of the case at bar. Zamora was asked to sign a written consent to search the residence at 2118 Fulton Street.[3] Zamora consented to the search and returned to the residence with officers. He had not been *Mirandized* when the officer asked him if there were any weapons in the house. Zamora indicated that there was a pistol under one of the mattresses. This question was posed several hours after Zamora was initially detained. There was no concern of officer safety, as Zamora was in the house with several officers. The weapons were not in plain view, nor were they in reach.

More relevant to our discussion are the cases that discuss the "public safety" exception.[4] These cases are more factually similar to Zamora's case. In *New York v. Quarles*, 467 U.S. 649 (1984), a young woman told two police officers that she had just been raped and that the assailant had entered a nearby store, carrying a gun. *Id.* at 651-52. The officers spotted the defendant-suspect

---

[3] This was after the vehicle in which he was riding had been stopped and a narcotics dog had alerted, although no drugs were found in the vehicle.

[4] The government did not argue the public safety exception in this case. These cases are cited because of the similar factual scenarios.

3

in the store, chased him down, and searched him. *Id.* at 652. Upon finding an empty holster, the officers asked the defendant where the gun was located prior to giving him the *Miranda* warnings. *Id.* The defendant told them where the gun was in the store. *Id.* The Court held that officers may ask *pre-Miranda* questions when there exists "an objectively reasonable need to protect the police or the public from any immediate danger associated with [a] weapon." *Id.* at 659 n.8. In support of the narrow exception in *Quarles*, the Supreme Court noted that the officer did not need to ask his question simply to elicit testimonial evidence, the kind of evil *Miranda* protected against, but rather the officer needed to insure that further damage to the public did not result from concealment of the gun. *Id.* at 657.

In applying the "public safety" exception, courts after *Quarles* maintain the narrowness of the exception and engage in fact-intensive inquiry. In *United States v. Mobley*, 40 F.3d 688, 690 (4th Cir.1994), officers arrived at the defendant's house to execute an arrest and search warrant. The defendant answered the door while naked, he was secured by agents while a security sweep was made, and the officers determined that he was alone in the house apparently unarmed. *Id.* He was advised that he was under arrest and was read his *Miranda* rights which he invoked. *Id.* As the defendant was being led away from the residence, officers asked if there was anything in the apartment which could be dangerous to the officers conducting the search warrant. *Id.* at 691. The defendant led the agents to a weapon in his bedroom closet. *Id.*

The Fourth Circuit addressed an initial issue holding that the "public safety" exception would apply to questions after post- *Miranda* protections were invoked to the same extent that it would apply to the *Quarles* situation involving pre- *Miranda* protections. *Id.* at 692-93. In holding that there were no "circumstances posing an objective danger to the public or police," the court noted that the

4

facts in this case "contrast sharply to those of *Quarles.*" *Id.* at 693. The defendant was encountered naked, a security sweep had been done, and he was the only person present in the residence. *Id.* The officers provided the court with no "extraordinary circumstances" that prompted the question about the weapon, and "[t]here is nothing that separates these facts from those of an ordinary and routine arrest scenario." *Id.* The Fourth Circuit specifically noted that "[a]bsent other information, a suspicion that weapons are present in a particular setting is not enough ... to demonstrate an objectively reasonable concern for immediate danger to police ..." *Id.* at 693 n.2; *Patmo, supra.*

The facts of Zamora's case vary greatly from *Quarles.* Zamora was not being pursued and he had been detained for several hours. The Government provides no evidence that the officers had an objectively reasonable belief that defendant had access to a weapon. *United States v. DeSumma*, 44 F.Supp. 2d 700, 704-705 (E.D. Pa. 1999).

The interactions between the officers and defendant prior to the questioning about weapons suggests nothing more than "an ordinary and routine arrest scenario." *See Mobley,* 40 F.3d at 693. It is understandable why arresting officers would want to ask questions about the location of possible weapons in an unfamiliar residence. Officers in similar situations may want to ask about weapons for officer safety as a matter of routine. However, incriminating responses by a defendant in custody cannot be used in court proceedings. The Government in this case provides no extraordinary circumstances to prompt the question about the weapon or to support a conclusion that an objectively reasonable need arose to protect the officers from an immediate danger as required by *Quarles.* As such, the question by Officer Gurley to the defendant violated *Miranda.* Therefore, suppression of

the defendant's response is appropriate, as is suppression of the firearm found pursuant to that statement.

Lake Charles, Louisiana, this 9 day of April, 2009.

PATRICIA MINALDI
UNITED STATES DISTRICT JUDGE